**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **GERARD JELLIG**, | |
| Plaintiff, | |
| v. | No. 23-cv-2659 (TSC) |
| **DISTRICT OF COLUMBIA**, *et al.*, | |
| Defendants. | |

**MEMORANDUM OPINION**

In September 2023, Plaintiff Gerard Jellig filed this lawsuit against his former employer,

the District of Columbia, and several District officials, alleging constitutional violations,

employment discrimination, and breach of contract. *See* Compl., ECF No. 1. The court stayed

the case pending resolution of Jellig's wrongful termination claim before the Office of Employee

Appeals ("OEA"). *See* Min. Order (March 12, 2025). After the OEA dismissed Jellig's claim,

the court lifted the stay and Defendants renewed their Motion to Dismiss. *See* Min. Order (Oct.

28, 2025); Defs.' 2d Mot. to Dismiss Br., ECF No. 24-1 ("MTD"). For the following reasons,

the court will GRANT in part and DENY in part Defendants' Motion.

## I.    BACKGROUND

Between July 2019 and June 2023, Jellig worked as an Instructional Superintendent at the

D.C. Public Schools ("DCPS"). Compl. ¶¶ 1, 17. As an Instructional Superintendent, Jellig was

a nontenured member of DCPS's Educational Service. *See id.* ¶ 17; *see also* D.C. Code § 1-

608.01a(b)(2)(A)(i). He "was the only white male over the age of fifty . . . in his position and

positions similar to it." Compl. ¶ 27. At unspecified points during his DCPS career, unidentified

"individuals leading meetings . . . would state that the mission of DCPS was to change all the

Page **1** of **22**

faces of DCPS's leadership and administration to 'black and brown faces.'" *Id.* ¶ 20. Jellig was also "chastised and derided for his age and inability to adapt to new technologies by coworkers and supervisors." *Id.* ¶ 26. Jellig's supervisor, DCPS Deputy Chancellor Drewana Bey, also excluded Jellig from meetings and "assumed [his] job duties" because of Jellig's "race and age." *Id.* ¶¶ 23–25.

During the 2021–2022 school year, Jellig raised concerns to Bey regarding issues at the Duke Ellington School of the Arts. Compl. ¶¶ 28. Jellig believed that Ellington's leadership was violating the Individuals with Disabilities Education Act and allowing sexual harassment by staff and between students "to go unreported." *Id.* ¶ 30. After DCPS asked Jellig to look into the "culture of rape" at Ellington, Jellig visited the campus three times and spoke with ninety students. *Id.* ¶¶ 32, 33. In Fall 2022, DCPS Chancellor Lewis Ferebee directed Jellig "to draft a comprehensive report" on his findings. *Id.* ¶ 34. Jellig completed his report in December 2022, and recommended that DCPS fire Ellington's principal, Sandi Logan. *Id.* ¶ 36. Chancellor Ferebee forwarded the report to D.C. Council Chairman Phil Mendelson but did not fire Logan. *Id.* ¶¶ 37, 39.

In March 2023, Jellig received two Notices of Investigation informing him that he was being investigated for misconduct during the 2021–2022 and 2022–2023 school years. Compl. ¶¶ 40, 42. The Notices "did not contain a statement of the charges." *Id.* ¶¶ 41, 43. In April 2023, Jellig was placed on administrative leave pending investigation and told not to communicate with any DCPS employees. *Id.* ¶¶ 44, 55. Soon thereafter, he attended a meeting with the Office of Labor Management and Employee Relations ("LMER"), where he learned that three principals, including Logan, had complained about his handling of their performance evaluations. *Id.* ¶¶ 45–47. Jellig was also informed that he had been accused of sexual

harassment. *Id.* ¶ 48. He offered to provide character witnesses and other exculpatory evidence, but LMER did not consider his offer. *Id.* ¶¶ 49–50. Jellig emailed Chancellor Ferebee and Deputy Chancellor Bey, refuting the charges. *Id.* ¶ 51.

In May 2023, LMER sent Jellig a Notice of Termination, stating that he was being fired for (1) "making threatening statements and statements with a threatening overtone towards the student accuser and her family" on the day he was placed on administrative leave, and (2) sending an email to Ferebee and Bey despite being told not to communicate with any DCPS employees pending investigation. Compl. ¶ 55. Jellig did not receive notice of the reasons for termination before he was terminated, nor was he given a hearing. *Id.* ¶ 59. He later learned that as a result of his termination, he was barred from employment at DCPS for three years. *Id.* ¶ 137.

To continue "his chosen career path as an educator," Jellig subsequently applied for several lower-level positions with DCPS and received a single offer for a position at Cardozo High School in July 2023. Compl. ¶¶ 61, 63. "The offer was solely conditioned on the position receiving funding," and Jellig "understood that there would be issues with the funding of the position." *Id.* ¶¶ 65, 135. Nevertheless, Cardozo's principal, Arthur Mola, agreed that Jellig "would occupy a substitute teaching position until his hired position became fully funded." *Id.* ¶ 135. After Jellig accepted the agreement, Mola introduced him to staff at Cardozo as the new Teacher & Education Training Instructor, and Jellig was added to the Cardozo listserv. *Id.* ¶¶ 66–67. In the lead-up to the 2023–2024 school year, Jellig attended numerous training seminars and planning meetings at Cardozo. *Id.* ¶ 68. The position never came to fruition, however, and "DCPS effectively rescinded the . . . offer." *Id.* ¶ 69. Mola also rescinded Jellig's offer to work as a substitute teacher in the event funding for the full-time position did not

materialize because "DCPS alerted Mr. Mola that [Jellig] was barred from employment with DCPS until 2026." *Id.* ¶ 137.

## II.   LEGAL STANDARDS

Jellig brings claims under both federal and D.C. law.  When deciding D.C. law claims, this court applies "state substantive law and federal procedural law." *Burke v. Air Sys. Int'l, Inc.*, 685 F.3d 1102, 1107 (D.C. Cir. 2012) (cleaned up).  Thus, although D.C. law supplies the substantive elements Jellig must allege to support his D.C. law claims, "the Federal Rules of Civil Procedure govern the question whether [Jellig] has pleaded sufficient facts to state a claim." *Bain v. Gary, Williams, Parenti, Watson, & Gary, P.L.*, 53 F. Supp. 3d 144, 147 (D.D.C. 2014).

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555).  "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).  That said, the court must "accept all the well-pleaded factual allegations of the complaint as true and draw all reasonable inferences from those allegations in the plaintiff's favor." *Banneker Ventures LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015) (citing *Iqbal*, 556 U.S. at 678).

### III.    ANALYSIS

#### A. Duplicative Counts

Defendants first contend that Count III is duplicative of Counts I and II.  *See* MTD at 5–7.  Count I asserts a violation of the Due Process Clause of the Fifth Amendment.  *See* Compl. ¶¶ 70–81.  Count II is a First Amendment retaliation claim.  *See id.* ¶¶ 82–92.  Count III claims Defendants' violations of the First and Fifth Amendment constitute violations of 42 U.S.C. § 1983.  *See id.* ¶¶ 104–05.

Critically, "section 1983 creates a cause of action to remedy certain deprivations of federal rights, but it is not a source of substantive rights."  *Pitt v. District of Columbia*, 491 F.3d 494, 510 (D.C. Cir. 2007).  In other words, the First and Fifth Amendments "may be enforced through section 1983," but a violation of section 1983 does not give rise to a separate cause of action.  *See id.*  Accordingly, the court will construe Counts I and II as brought through section 1983 but dismiss Count III as purely "duplicative" because it "stem[s] from identical allegations" that Defendants violated Jellig's First and Fifth Amendment rights.  *Perez v. D.C. Dep't of Emp. Servs.*, 305 F. Supp. 3d 51, 59 (D.D.C. 2018) (quoting *Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 81 (D.D.C. 2010)).

#### B. First Amendment

Jellig claims that Defendants violated the First Amendment by firing him in retaliation for his "alleged speech in this matter (*i.e.*, the report made regarding the Duke Ellington School of the Arts)."  Jellig Opp'n at 5, ECF No. 25; *see also* Compl. ¶¶ 82–92.  "[T]he First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern."  *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006).  But "when public employees make statements pursuant to their official duties, the employees are not

speaking *as citizens* for First Amendment purposes." *Id.* at 421 (emphasis added).  Rather, they are speaking as employees, "and the Constitution does not insulate their communications from employer discipline." *Id.*  Thus, the "threshold question for a public employee's First Amendment claim is whether the employee spoke as a citizen." *Winder v. Erste*, 566 F.3d 209, 214 (D.C. Cir. 2009) (cleaned up).  If not, "he cannot claim constitutional protection." *Id.* (cleaned up).  "When employees make recommendations to supervisors on subjects directly related to their jobs, they are speaking as employees even if the supervisors discourage this speech." *Thompson v. District of Columbia*, 530 F.3d 914, 917 (D.C. Cir. 2008).

Jellig has failed to allege that he spoke as a citizen when he wrote the report regarding Ellington and made recommendations about how to address issues there.  The Complaint itself establishes that Jellig wrote the report as an employee: DCPS leadership sent him to Ellington to study the issues and then asked him to write an official report.  Compl. ¶¶ 32, 34.  This case thus closely resembles *Garcetti*, where the Supreme Court held that a prosecutor "did not speak as a citizen by writing a memo that addressed the proper disposition of a pending criminal case."  547 U.S. at 422.  Like the prosecutor in *Garcetti*, Jellig was doing precisely what his position as a senior administrator required of him—writing a report at the request of DCPS leadership on an issue within the scope of his job responsibilities.  Under the First Amendment, DCPS cannot be held liable for punishing Jellig for something he said in his report because an employer is permitted "control over what the employer itself has commissioned or created." *Garcetti*, 547 U.S. at 422.

According to his own Opposition, the speech for which Jellig was fired is "the report" he was assigned to write "regarding the Duke Ellington School of the Arts."  Jellig Opp'n at 5. Because that report was prepared pursuant to his official duties, that ends the analysis.  But even

if Jellig had not made that concession limiting the scope of his claim, his claim would still fail.

It does not matter that Jellig alerted Deputy Chancellor Bey to potential problems at Ellington

before he was formally tasked with the study and report.  *See* Compl. ¶ 86.  By Jellig's own

allegations, his responsibilities as an Instructional Superintendent included supervising Ellington.

*See id.* ¶¶ 32–36, 46–47.  Reporting misconduct at a school under his supervision to DCPS

leadership plainly falls within his official duties as a senior administrator.  *Cf. Mpoy v. Rhee*, 758

F.3d 285, 291–94 (D.C. Cir. 2014) (teacher's email to DCPS Chancellor regarding misconduct of

teaching assistants was made pursuant to teacher's official duties).  Because Jellig spoke about

issues at Ellington pursuant to his official duties as a DCPS employee and not as a citizen, the

Constitution does not protect that speech and his First Amendment claim, Count II, must be

dismissed.  *See Garcetti*, 547 U.S. at 421.

### C.  Due Process

The Fifth Amendment, which "applies to the government of the District of Columbia,"

"guarantees that 'no person shall . . . be deprived of life, liberty, or property, without due process

of law.'"  *McKinney v. District of Columbia*, 142 F.4th 784, 792 (D.C. Cir. 2025) (quoting U.S.

Const. amend. V).  To state a due process claim, Jellig must allege that the government deprived

him of a cognizable liberty or property interest without due process.  *See NB ex rel. Peacock v.*

*District of Columbia*, 794 F.3d 31, 41 (D.C. Cir. 2015).  Although Jellig failed to allege the

deprivation of a property interest, he has sufficiently alleged a deprivation of a liberty interest.

Defendants do not contest at this stage that if Jellig was in fact deprived of a liberty interest, he

was denied the process due.  *See* MTD at 8–16.

a. <u>Property Interest</u>

The Constitution does not itself create property interests; instead, such interests are "created and . . . defined by existing rules or understandings that stem from an independent source such as state law." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538 (1985) (cleaned up). Thus, Jellig "had a property interest in his job only if, under District of Columbia law, he did not serve in his job at his employer's will, but he could be removed only for cause." *Thompson v. District of Columbia*, 530 F.3d 914, 918 (D.C. Cir. 2008) (cleaned up). "If the employee serves at will—that is, if the government may remove [him] for any constitutionally permissible reason or for no reason at all," "the employee has no property interest because there is no objective basis for believing that [he] will continue to be employed indefinitely." *Esparraguera v. Dep't of the Army*, 101 F.4th 28, 33 (D.C. Cir. 2024) (cleaned up).

Jellig was a member of the DCPS Educational Service. *See* Compl. ¶ 17 ("Plaintiff was employed as an Instructional Superintendent, a member of the 'Educational Service' of DCPS[.]"). With exceptions not relevant here, D.C. law clearly establishes that members of the Educational Service are non-tenured employees at will. *See* D.C. Code § 1-608.01a(b)(2)(A)(i) ("[A] person appointed to a position within the Educational Service shall serve without job tenure."). The Code further specifies that even after a probationary period, a member of the Educational Service "may be terminated, at the discretion of the Mayor; provided, that the employee has been provided a 15-day separation notice and has had at least one evaluation within the preceding 6 months." *Id.* § 1-608.01a(b)(2)(C)(ii). To be sure, this latter provision provides the employee with some procedural protections. But it places no *substantive* limit on the Mayor's discretion to fire a member of the Educational Service. *See Langeman v. Garland*, 88 F.4th 289, 295 (D.C. Cir. 2023) (To create a cognizable property interest, "the independent

source must place *substantive* limitations on official discretion." (emphasis added) (cleaned up)). As described above, an "employee serves at will . . . if the government may remove [him] for any constitutionally permissible reason or for no reason at all." *See Esparraguera*, 101 F.4th at 33 (cleaned up). Because nontenured members of the Educational Service can be removed at the Mayor's discretion for no reason at all, they are at will employees and therefore have no constitutionally cognizable property interest in their positions.

Although the Mayor may circumvent the 15-day notice of separation and evaluation protections only for certain reasons, *see* D.C. Code § 1-608.01a(b)(2)(D), that does not alter the conclusion that a nontenured member of the Educational Service is removable at will. Subparagraph (D) merely identifies circumstances in which the Mayor can dispense with even the minimal procedural protections that subparagraph (C) otherwise provides; it does not mean that a member of the Educational Service "can 'be removed only for cause.'" *Esparraguera*, 101 F.4th at 33 (quoting *Thompson*, 530 F.3d at 918). In other words, Subparagraph (D) does nothing to disturb the default rule that a member of the Educational Service is terminable at the Mayor's discretion—that is, "for any constitutionally permissible reason or for no reason at all." *Id.* (cleaned up). Because Jellig had no constitutionally cognizable property interest in his continued employment, he cannot allege the deprivation of a property interest.

b. Liberty Interest

"One of the liberty interests protected by the Fifth Amendment is the right to 'follow a chosen profession free from unreasonable governmental interference.'" *Campbell v. District of Columbia*, 894 F.3d 281, 288 (D.C. Cir. 2018) (quoting *Greene v. McElroy*, 360 U.S. 474, 492 (1959)). "But loss of a specific public job, standing alone, does not implicate a liberty interest." *McKinney v. District of Columbia*, 142 F.4th 784, 795 (D.C. Cir. 2025). To state a claim for

"deprivation of a liberty interest without due process where an employee is terminated," the employee must allege either one of two theories: "reputation-plus" or "stigma or disability." *Langeman*, 88 F.4th at 296 (cleaned up). Jellig asserts that he "is pursuing a stigma or disability claim." Jellig Opp'n at 10. To state a stigma or disability claim, Jellig must allege either that he was "formally or automatically excluded" from certain government opportunities or that the government action "had the effect of broadly precluding plaintiff from pursuing [his] chosen career." *Langeman*, 88 F.4th at 297 (cleaned up). His Complaint sufficiently alleges the former.

In *Kartseva v. Department of State*, the D.C. Circuit explained that if the State Department's "action formally or automatically exclude[d] [the plaintiff] from work on some category of future State contracts or from other government employment opportunities, that action change[d] her formal legal status and thus implicates a liberty interest." 37 F.3d 1524, 1528 (D.C. Cir. 1994). Here, Jellig alleges that "DCPS alerted Mr. Mola that Plaintiff was barred from employment with DCPS until 2026," apparently as a result of his termination. Compl. ¶ 137. Drawing "all reasonable factual inferences in [Jellig's] favor," *Naz v. Wright*, 177 F.4th 1242, 1246 (D.C. Cir. 2026), this three-year bar on DCPS employment sufficiently asserts that a formal or automatic disqualification from "some category" of opportunities with DCPS flowed from his termination and amounts to a "tangible change" in his legal status with respect to his eligibility for employment at DCPS. *Kartseva*, 37 F.3d at 1527–28.

     c.  <u>Municipal Liability</u>

Having found that Jellig adequately alleged a predicate constitutional violation, the court must now "determine whether the complaint states a claim that a custom or policy of the municipality caused the violation" such that the District can be held liable as a municipality under § 1983. *Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003). A custom

or policy exists for purposes of municipal liability "when (1) the municipality adopts a policy that itself violates the Constitution; (2) the unconstitutional action was taken by a policy maker within the government; (3) the employees' unconstitutional actions are so consistent that they have become a custom of the municipality of which the supervising policymaker must have been aware; or (4) the municipality knew or should have known of a risk of constitutional violations, but showed deliberate indifference to that risk by failing to act." *Hurd v. District of Columbia*, 997 F.3d 332, 337 (D.C. Cir. 2021) (cleaned up). Jellig attempts to establish municipal liability for the deprivation of his liberty interest under the second theory.[1] He contends that his liberty interest was deprived without due process of law by a final policymaker—either Mayor Bowser, Chancellor Ferebee, Deputy Chief Towe, or Deputy Chancellor Bey. *See* Jellig Opp'n at 19.

Under the second theory, "municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986) (cleaned up). Although Mayor Bowser was named in the statute as having discretion to terminate members of the Educational Service, *see* D.C. Code § 1-608.01a(b)(2)(C), there is no indication that she had the power to establish final government policy with respect to terminations. As the Supreme Court made clear, "the fact that a particular official—even a policymaking official—has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise

---

[1] Jellig argues that the District is municipally liable under the first theory because it adopted an interpretation of D.C. Code § 1-608.01a that deprives Educational Service members of a property interest without due process. *See* Jellig Opp'n at 15–19. But the court has already concluded that Jellig did not have a constitutionally cognizable property interest under that statute. *See supra* Part III.C.a. Jellig's municipal liability argument with respect to D.C. Code § 1-608.01a is irrelevant to whether the District had a policy of barring terminated employees from reemployment at DCPS, and therefore depriving them of a liberty interest, without due process.

of that discretion" because "the official must also be responsible for establishing final government policy respecting such activity." *Pembaur*, 475 U.S. at 481–82 (cleaned up). Moreover, even if Mayor Bowser was a final policymaker with respect to termination policy, it does not follow that she had "final authority to establish municipal policy" with respect to an automatic or formal disqualification from future DCPS employment by terminated members of the Educational Service. *Id.* at 481. And beyond Jellig's conclusory contention that Ferebee, Towe, and Bey were final policymakers, Compl. ¶ 101, he offers no factual allegations to substantiate that bare assertion. Accordingly, Jellig has failed to adequately allege municipal liability for the alleged deprivation of his liberty interest. His Fifth Amendment claim against the District will be dismissed.

### d. Individual Defendants

Jellig also sues Bowser, Ferebee, Towe, and Bey in their individual capacities, alleging that they "collectively and/or individually effectuated his termination" and subsequent disqualification from DCPS employment without affording him due process. Jellig Opp'n at 8; *see also* Compl. ¶ 101 (alleging "Bowser, Ferebee, Towe, and/or Bey" terminated Jellig). To sue an official in her individual capacity, the "complaint must at least allege that the defendant . . . official was personally involved in the illegal conduct." *Simpkins v. D.C. Gov't*, 108 F.3d 366, 369 (D.C. Cir. 1997). Here, Jellig adequately alleges that each individual Defendant was involved in his termination and disqualification. To start, D.C. Code § 1-608.01a(b)(2)(C) gives the Mayor discretion over termination decisions. Her position as the statutory decisionmaker thus supports a plausible inference that Bowser was involved in the relevant decisions. Towe, as Deputy Chief of LMER, signed Jellig's Notice of Termination. *See* Pl.'s Ex. 1 at 4, ECF No. 25-1. And Jellig alleges that he was fired in retaliation for raising concerns about issues at

Ellington, issues with which both Ferebee and Bey were closely involved.  Compl. ¶¶ 28, 34, 36, 51, 122.  Accepting these allegations as true and drawing all reasonable inferences in Jellig's favor, the court concludes that Jellig has alleged just enough personal involvement by each individual Defendant to survive Defendants' Motion to Dismiss.

The question remains, however, whether the individual Defendants are entitled to qualified immunity.  "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  According to Defendants, Jellig failed to allege that they "violated a clearly established right."  MTD at 12.  The court disagrees.

In *Kartseva*, the D.C. Circuit held that if the government "formally or automatically excludes [a plaintiff] from . . . some category of future" government employment opportunities, "that action changes [the plaintiff's] legal status and thus implicates a liberty interest."  37 F.3d at 1528.  By barring Jellig from employment with DCPS until 2026 without notice or an opportunity to be heard, *see* Compl. ¶ 137, Defendants deprived Jellig of his clearly established liberty interest.  It is an "essential principle of due process" that Defendants were required to provide notice and an opportunity to be heard with respect to a deprivation of a liberty interest. *Esparraguera*, 101 F.4th at 40 (quoting *Loudermill*, 470 U.S. at 542).  Jellig's Fifth Amendment claim, Count I, therefore survives insofar as it asserts the deprivation of a liberty interest by the individual Defendants.

### D.  D.C. Human Rights Act

Jellig also brings claims under the D.C. Human Rights Act ("DCHRA") for age and race discrimination, and retaliation.  *See* Compl. ¶¶ 113–14, 122–23.  When presented with claims under the DCHRA, this court applies D.C. substantive law and must seek to "achieve the same outcome" that the D.C. Court of Appeals would reach if it were to decide the case.  *Novak v. Cap. Mgmt. & Dev. Corp.*, 452 F.3d 902, 907 (D.C. Cir. 2006).  The D.C. Court of Appeals, in turn, consistently relies upon federal decisions interpreting Title VII and the Age Discrimination in Employment Act as persuasive authority in DCHRA cases.  *Daka, Inc. v. Breiner*, 711 A.2d 86, 94 (D.C. 1998); *Cain v. Reinoso*, 43 A.3d 302, 308 n.18 (D.C. 2012); *see also Carpenter v. Federal Nat'l Mortg. Ass'n*, 165 F.3d 69, 72 (D.C. Cir. 1999) (noting that D.C. courts generally "accept the federal constructions of Title VII, given the substantial similarity between it and the D.C. Human Rights Act").  Thus, in analyzing Jellig's DCHRA claims, this court draws on case law from both the D.C. Court of Appeals and the D.C. Circuit.

### a.  Age and Race Discrimination

The DCHRA "prohibits employers" from taking adverse employment actions against an employee "based on . . . protected traits," including age and race.  *Kumar v. D.C. Water & Sewer Auth.*, 25 A.3d 9, 16 (D.C. 2011).  Jellig contends that he "suffered an adverse employment action when [Deputy Chancellor] Bey excluded [him] from performing his job duties," Jellig Opp'n at 20, including by hiring an administrator at Bard College and High School "without [his] input, advice, or approval" and by excluding him "from meetings and information relevant for him to complete his primary job duties."  Compl. ¶¶ 22–24.  The court will assume without deciding that this constituted an adverse action.  But to survive a motion to dismiss, the Complaint must also raise an inference that Jellig's age or race motivated this adverse action.

*Joyner v. Morrison & Foerster LLP*, 140 F.4th 523, 530 (D.C. Cir. 2025) ("[A] plaintiff must plead facts sufficient to allow a plausible inference that the challenged action was taken because of his [protected trait]."); *see also Brandywine Apartments, LLC v. McCaster*, 964 A.2d 162, 167–68 (D.C. 2009) ("To establish a claim of intentional discrimination . . . the plaintiff must prove intentional and purposeful conduct based on his membership in a protected class."). Jellig has failed to do so. Although he asserts that Bey took these actions against him "due to his race and age," Compl. ¶ 25, that "threadbare recital of [an] element[]" is not a factual allegation that raises an inference of discriminatory motive. *See Joyner*, 140 F.4th at 530 (quoting *Iqbal*, 556 U.S. at 678). And none of Jellig's other assertions rescue his claim.

With respect to his age discrimination claim, Jellig asserts that he was "chastised and derided for his age and inability to adapt to new technologies by coworkers and supervisors." Compl. ¶ 26. The bare assertion that he was "derided for his age," *id.*, is a "mere conclusory statement[]" "devoid of further factual enhancement," and therefore fails to raise an inference of discrimination. *Iqbal*, 556 U.S. at 678 (cleaned up). The allegation that he was chastised for his inability to adapt to new technologies is not conclusory, but it is "ambiguous and does not clearly refer to" Jellig's age. *Said v. Nat'l R.R. Passenger Corp.*, 317 F. Supp. 3d 304, 322 (D.D.C. 2018) (quoting *Hajjar-Nejad v. George Wash. Univ.*, 37 F. Supp. 3d 90, 125 (D.D.C. 2014)). It therefore does not "itself show bias" and does not constitute direct evidence of discrimination. *Said*, 317 F. Supp. 3d at 322 (cleaned up). At most, it is weak circumstantial evidence of potential age-related bias among his supervisors, but in the absence of other circumstances suggesting that ageism influenced Bey's exclusion decision, there are insufficient allegations "to make it plausible, as opposed to just speculative, to infer that [Defendants were] motivated by

[Jellig's age] rather than the myriad other reasons that might affect an employment decision." *Joyner*, 140 F.4th at 531 (cleaned up).

With respect to his race discrimination claim, Jellig "recalls numerous incidences of individuals leading meetings at DCPS where the individual would state that the mission of DCPS was to change all the faces of DCPS's leadership and administration to 'black and brown faces.'" Compl. ¶ 20.  If Jellig had alleged that the individuals who made such comments were "decision makers [behind the adverse action], or those who have input into the decision," their discriminatory remarks around the relevant time could support an inference that the adverse action was motivated by animus.  *Forman v. Small*, 271 F.3d 285, 293 (D.C. Cir. 2001).  But Jellig has not alleged that Bey—or anyone with input into her decisions—made such remarks. Nor has Jellig specified when the remarks were made, leaving the court with no basis to infer that they occurred around the relevant time. Stray statements made by "non-decisionmakers," months or years before the relevant decision, do not constitute "direct evidence" of discrimination and, at most, constitute weak circumstantial evidence that fails to support a plausible inference of discrimination.  *Abdelhamid v. Lane Constr. Corp.*, 744 F. Supp. 3d 10, 20 (D.D.C. 2024) (quoting *Oviedo v. WMATA*, 299 F. Supp. 3d 50, 59 (D.D.C. 2018)).

Finally, Jellig alleges that he "was the only white male over the age of fifty . . . in his position and positions similar to it."  Compl. ¶ 27.  But "this is too thin a reed" on which to rest "an inference of race or age discrimination."  *Bryant v. Brownlee*, 265 F. Supp. 2d 52, 65 (D.D.C. 2003).  It is well established that "the fact that a plaintiff is the only member of a protected class in an office does not 'suffice to make the necessary causal connection' between the plaintiff's race or [age] 'and the alleged mistreatment.'"  *Gorecki v. Bondi*, No. 24-3168, 2026 WL 890413, at *7 (D.D.C. Mar. 31, 2026) (quoting *Singh v. U.S. House of Representatives*,

300 F. Supp. 2d 48, 57 (D.D.C. 2004)).  "In the absence" of more substantial circumstantial evidence "of race or age bias, the uniqueness of plaintiff's race and age in [his] workplace cannot substantiate a claim" of discrimination.  *Bryant*, 265 F. Supp. 2d at 65.  Count IV will therefore be dismissed.

### b.  Retaliation

Count V alleges that Defendants retaliated against Jellig by opening an investigation, placing him on administrative leave, and ultimately firing him because he authored a report opposing sexual harassment at Ellington.  Compl. ¶¶ 122–23.  To state a retaliation claim under the DCHRA, a plaintiff must allege that "(1) [he] was engaged in protected activity, or that [he] opposed practices made unlawful by the DCHRA; (2) the employer took an adverse personnel action against him; and (3) a causal connection existed between the two."  *McFarland v. Geo. Wash. Univ.*, 935 A.2d 337, 356 (D.C. 2007) (cleaned up) (quoting *Howard Univ. v. Green*, 652 A.2d 41, 45 (D.C. 1994)).  Defendants do not, at this stage, dispute that Jellig opposed practices made unlawful by the DCHRA or that DCPS took adverse actions against him.  *See* MTD at 18–20.  They contend only that Jellig has failed to allege a causal connection between the two.  *See id.*

The Complaint alleges facts sufficient to establish causation.  Jellig completed the Ellington report in December 2022 and was placed under investigation in March 2023, with his suspension and termination following soon thereafter.  *See* Compl. ¶¶ 36, 40, 42, 44, 55.  Thus, approximately three months separate Jellig's protected activity from the first alleged adverse action, and each subsequent adverse action flowed swiftly from that one.  Temporal proximity alone can "support an inference of causation . . . 'where the two events are very close in time.'"  *Pueschel v. Chao*, 955 F.3d 163, 167 (D.C. Cir. 2020) (quoting *Hamilton v. Geithner*, 666 F.3d

1344, 1357 (D.C. Cir. 2012)). In *Hamilton*, the D.C. Circuit held that a gap of just under three months sufficed. *See* 666 F.3d at 1358–59. The interval alleged here is comparable, and courts in this district have treated three-month gaps as "sufficient to establish temporal proximity." *Walden v. Patient-Centered Outcomes Rsch. Inst.*, 177 F. Supp. 3d 336, 344 (D.D.C. 2016); *see also Brodetski v. Duffey*, 199 F.R.D. 14, 20 (D.D.C.2001) (observing that "courts generally have accepted time periods of a few days up to a few months"). At the pleading stage, that temporal proximity alone suffices to allege causation. Count V may therefore proceed.

### E. Breach of Contract

The District moves to dismiss Jellig's breach of contract claim on the ground that no valid contract existed. *See* MTD at 20–22. Under D.C. law, an enforceable contract exists if there is "both (1) agreement as to all material terms, and (2) intention of the parties to be bound." *Kramer Assocs., Inc. v. Ikam, Ltd.*, 888 A.2d 247, 251 (D.C. 2005) (quoting *Georgetown Ent. Corp. v. District of Columbia*, 496 A.2d 587, 590 (D.C. 1985)). "Unless the statute of frauds requires otherwise . . . , the contract need not be written; parties may be bound by their oral agreement if it meets the dual requirements of intent and completeness." *Kramer*, 888 A.2d at 251 (cleaned up).

The District does not contend that the statute of frauds required Jellig's alleged employment contract to be written. Instead, it points to a provision of the D.C. Procurement Practices Reform Act ("PPRA") which provides that a "District employee shall not enter into an oral agreement with a contract to provide goods or services to the District government without a valid written contract." D.C. Code § 2-359.01(a). But that provision does not apply to employment contracts. The PPRA provides that the "term 'services' shall not include the furnishing of time, labor, or effort pursuant to employment agreements or collective bargaining

agreements." *Id.* § 2-351.04(58). And the provision of labor plainly is not a good. The cited provisions of the PPRA therefore did not require Jellig's agreement with Mola to be written.

At this early stage in the litigation, Jellig has adequately alleged an agreement as to all material terms and an intent to be bound. Indeed, the "parties' conduct *after* they reach an alleged oral agreement" is relevant to establishing that they had the "intent to be bound." *Steven R. Perles, P.C. v. Kagy*, 473 F.3d 1244, 1249 (D.C. Cir. 2007) (emphasis in original). And here, Jellig alleges several facts indicating that he and Mola reached an agreement. Specifically, Mola introduced Jellig to Cardozo staff as the new Teacher & Education Training Instructor, Jellig was added to the Cardozo educator listserv, and Jellig attended numerous planning meetings in the lead-up to the next school year. Compl. ¶¶ 66–68. It is unlikely that either party would have engaged in such conduct without a prior meeting of the minds.

The District points out that Jellig's appointment as a Teacher & Education Training Instructor was conditioned on the allocation of funding. *See* MTD at 21 (citing Compl. ¶ 65). They argue that because that appointment was conditional, Jellig has failed to allege the existence of a valid contract. *See* MTD at 21. Not so. "A condition precedent may be defined as 'an event, not certain to occur, which must occur, unless its non-occurrence is excused, before performance under a contract becomes due.'" *Wash. Props., Inc. v. Chin, Inc.*, 760 A.2d 546, 549 (D.C. 2000) (quoting Restatement (Second) of Contracts § 224 (A.L.I. 1981)). Thus, the non-occurrence of a condition precedent does not mean that a contract containing that condition does not exist; it simply means that a party is not obligated to perform the specific duty made contingent on the occurrence of a condition. *See id.* Because Jellig does not allege that the funding for his full-time position materialized, the District was not obligated to perform the duty of appointing him to said position. *See id.* However, the non-occurrence of that condition

precedent does not negate the existence of a contract between Jellig and the District. *See Western Surety Co. v. U.S. Engineering Co.*, 375 F. Supp. 3d 1, 5–6 (D.D.C. 2019). And under that contract, Mola promised to make Jellig a substitute teacher if Cardozo did not receive funding for the full-time position. *See* Compl. ¶ 135. Because funding for the full-time position did not materialize, the District's obligation to appoint Jellig as a substitute teacher became due. *See Wash. Props.*, 760 A.2d at 549. Jellig adequately alleges that the District breached this duty by failing to appoint him as a substitute teacher because of the three-year bar on his employment at DCPS. *Id.* ¶¶ 137–38. He has therefore stated a claim for breach of contract under D.C. law.

### F.  Promissory Estoppel

A promissory estoppel claim allows a party to seek enforcement of a promise in the absence of a valid contract. *See Plesha v. Ferguson*, 725 F. Supp. 2d 106, 111 (D.D.C. 2010). Because a promissory estoppel claim cannot succeed where an enforceable contract exists, courts "generally prohibit litigants from asserting" such a claim when it is undisputed that a valid contract governs the parties' conduct. *See id.*; *see also Schiff v. AARP*, 697 A.2d 1193, 1194 (D.C. 1997) ("There can be no claim for unjust enrichment when an express contract exists between the parties."). But because the parties dispute whether a valid contract exists, the court will permit Jellig to plead promissory estoppel and breach of contract as alternative claims. *See E.M. v. Shady Grove Reprod. Sci. Ctr. P.C.*, 496 F. Supp. 3d 338, 396 (D.D.C. 2020) (Plaintiff "cannot succeed on both her breach claim and her promissory estoppel claim, but if the former fails she may argue the latter to the jury."); *see also McNamara v. Picken*, 950 F. Supp. 2d 125, 128 (D.D.C. 2013) ("[A] plaintiff may plead inconsistent theories of liability, and may even argue alternative claims to a jury.").

To assert a promissory estoppel claim against the District, Jellig must allege: "(1) a promise made, (2) reasonable reliance on that promise, (3) an injury caused by breach of the promise, and (4) a showing that enforcement of the promise would be made in the public interest and would prevent injustice." *Aziken v. District of Columbia*, 194 A.3d 31, 37 (D.C. 2018).  At this stage, the District disputes only the second element.[2]  It contends that Jellig failed to allege reasonable reliance on Mola's promise of employment during the 2023–2024 school year.  *See* MTD at 22.  According to the District, Jellig's reliance was not reasonable because Jellig "knew that there were issues with the funding for his position, and that he would not be employed until the position was fully funded."  *Id.*  That argument is unavailing.  Because Mola and Jellig both "understood that there would be issues with the funding of the [full-time] position," they "agreed that [Jellig] would occupy a substitute teaching position" until funding for the full-time position materialized.  Compl. ¶ 135.  Thus, the court cannot find that it was unreasonable for Jellig to expect some form of employment by DCPS—either the full-time *or* substitute teaching position.  Jellig's promissory estoppel claim therefore survives the Motion to Dismiss.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' Second Motion to Dismiss, ECF No. 24, is GRANTED in part and DENIED in part.  Counts II, III, and IV will be dismissed.  Counts V, VI, and VII will be permitted to proceed.  Count I may also proceed but only to the extent it asserts the deprivation of a liberty interest by the individual Defendants.  A separate order will follow this opinion.

---

[2]  To the extent the District raised additional arguments in its reply brief, those arguments are forfeited.  *See United States v. Johnson*, 158 F.4th 200, 207 (D.C. Cir. 2025).

Date: August 4, 2026

_Tanya S. Chutkan_
TANYA S. CHUTKAN
United States District Judge